Filed 5/19/25

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

|  |  |
|---|---|
| JAYDEN DEMARKO McDANIEL,<br><br>    Petitioner,<br><br>v.<br><br>THE SUPERIOR COURT OF<br>SAN MATEO COUNTY,<br><br>    Respondent;<br><br>THE PEOPLE,<br><br>    Real Party in Interest. | A171858<br><br>(San Mateo County<br>Super. Ct No. 22-NF-014642-E) |

Petitioner Jayden Demarko McDaniel, a Black individual, alleges he was disparately charged with gang enhancements due to his race, ethnicity, or national origin in violation of the California Racial Justice Act of 2020 (Stats. 2020, ch. 317, §§ 1–7; RJA or the Act). In this writ proceeding, McDaniel challenges the trial court's order holding that he failed to demonstrate "good cause" to obtain evidence from the prosecution relevant to a potential violation of the Act. (Pen. Code,[1] § 745, subd. (d).) For the reasons explained below, we vacate the trial court's order and remand with directions.

---

[1] All undesignated statutory references are to the Penal Code.

## BACKGROUND

The San Mateo County District Attorney (District Attorney) filed a felony complaint charging five defendants, including McDaniel, with attempted first degree murder (§§ 664, 187, subd. (a); counts 1 & 2), assault with a firearm (§ 245, subd. (a)(2); counts 3 & 4), carrying a concealed firearm in a vehicle by an active participant in a criminal street gang (§ 25400, subd. (a)(1); count 5), unlawful possession of a firearm by a felon (§ 29800, subd. (a)(1); count 6), active participation in a criminal street gang (§ 186.22, subd. (a); count 7), conspiracy to commit a felony by active street gang participants (§ 182.5; count 8), and conspiracy to commit assault with a firearm (§ 182, subd. (a)(1); count 9). The information further alleged personal and intentional discharge of a firearm (§ 12022.53, subd. (c)) as to counts 1 through 4, infliction of great bodily injury (§ 12022.7, subd. (a)) as to counts 1 and 3, and commission of the offenses for the benefit of, at the direction of, and in association with a criminal street gang (§ 186.22, subd. (b)(1)(C)) as to counts 1 through 4.

McDaniel subsequently filed a motion for data under the RJA. That motion sought information regarding: (1) cases in which a violation of sections 664/187, 245, 245.2, 245.3, 245.5, 12022, 12022.3, 12022.5, 12022.53, 12022.55, 12022.7, 12022.75, 12022.8, 12022.9, 12022.95, 182, 182.5, and/or 186.22 were charged or alleged; (2) for each case, the date of offense, case number, date of filing, name of the defendant, date of birth of the defendant, race and ethnicity of the defendant, address of the defendant, and list of all charges, enhancements, prior conviction allegations, and any other allegations filed; (3) policies concerning the charging of gang enhancements pursuant to section 186.22 et seq.; and (4) records showing any statistical

analysis by the District Attorney concerning the racial demographics of those who are charged with gang enhancements pursuant to section 186.22 et seq.[2]

McDaniel argued the requested records were relevant to prove a violation of the RJA; namely, that the District Attorney's office more frequently charged gang enhancements against Black defendants as compared to defendants of other races who committed similar offenses and were similarly situated. McDaniel further argued the request easily satisfied the low good cause standard for discovery under the RJA.

In support of his motion, McDaniel asserted the Legislature has acknowledged that statistical evidence demonstrates that California's gang-related charges and enhancements have a disproportionate impact on persons of color. That statistical evidence indicates the non-Latino Black population in San Mateo County is 2.7 percent whereas 9.62 percent of felons with a section 186.22, subdivision (a) or (b), conviction are Black. Similarly, a 2020 report published by the Committee on Revision of the Penal Code found that 10.9 percent of individuals serving gang enhancements in state prison from San Mateo County were Black though the non-Latino Black population in San Mateo County was only 2.7 percent. In stark contrast, only approximately 3.63 percent of individuals serving gang enhancements in state prison from San Mateo County were White though the White population in San Mateo County was 56.9 percent. McDaniel contends these statistics may also be related to evidence indicating that, in San Mateo County, Black individuals are arrested 6.6 times as frequently as White individuals, and significant gaps between Black and White populations exist in the areas of

_____

[2] Prior to filing his discovery motion pursuant to the RJA, McDaniel sought a similar set of materials from the District Attorney via a California Public Records Act (Gov. Code, § 7920 et seq.) request. The District Attorney declined to provide any documents.

3

home ownership, per capita income, poverty, average annual wages for full-time workers, and unemployment. McDaniel claimed these statewide and county-wide statistics indicated Black individuals may be disproportionately charged with gang enhancements and provided good cause for additional discovery to evaluate whether an RJA violation may have occurred.

The District Attorney's office opposed the motion on the basis that McDaniel failed to demonstrate good cause to support discovery under the RJA. This argument was grounded in the motion's failure to identify specific facts regarding McDaniel's case and failure to identify specific facts from other cases involving non-Black defendants who were similarly situated and engaged in similar conduct. The opposition acknowledged—and did not dispute—McDaniel's "broad-based data" indicating (1) Black defendants were disproportionately identified as gang members and incarcerated at least in part on gang enhancement convictions, and (2) the historical context of racism in San Mateo County. However, the opposition argued the data and historical context were insufficient because "the same set of broad-based data could be submitted blindly in every case involving a Black or Latinx gang member."

In reply, McDaniel submitted a supplemental declaration by Dr. Beth Redbird, an assistant professor in the Department of Sociology at Northwestern University with "expertise in survey design and analysis, big data, and the measurement of invisible or hard to quantify processes." The declaration notes Dr. Redbird has served as an expert "on the measurement of racialized processes in multiple court cases" and is familiar with "multiple sources of criminal justice data." In evaluating data regarding arrests, bookings, and incarceration, Dr. Redbird concluded Black defendants are overrepresented in incarceration and the analysis is "robust in determining

4

the presence of § 664–187(a) disparity" and "valid (if not accurate)" in finding a racial disparity in connection with gang enhancements. She commented that further data was required to conduct a more detailed disparity assessment.

During the subsequent hearing, the court expressed concerns with the reliability of the proffered statistics, asking, "[D]on't I need to know the percentage of ethnicities of all gang members in the county to know if there is a disparity?" The court also noted the defendants were not from San Mateo County and asked whether county population statistics were even relevant: "[S]houldn't I . . . look at the breakdown of the percentage of gang members in San Mateo County?" At the same time, the court acknowledged the statistics indicated a disparity and stated, "[T]he defense is at a disadvantage because I don't know how you get to the point of making a prima facie evidence case unless you get records." Ultimately, the court concluded it was "missing context" for the proffered statistics, and found McDaniel did not meet the requisite threshold "without additional specific facts" such as the case-specific facts raised in *Young v. Superior Court* (2022) 79 Cal.App.5th 138, 156 (*Young*).[3] It thus denied the motion without prejudice.

McDaniel filed a petition for writ of mandate with this court, which was denied without prejudice on the basis that McDaniel was required to first seek review in the superior court because the discovery motion ruling was rendered by a magistrate.

---

[3] *Young* identified three sources of evidentiary support for discovery under the RJA: (1) the defendant's race, (2) studies showing Black drivers are more likely to be stopped than other racial groups, and (3) the circumstances of the defendant's traffic stop suggest it was racially motivated. The court acknowledged McDaniel may have met the first two prongs, but found the third prong missing.

5

McDaniel subsequently refiled his petition with the superior court, asserting he demonstrated good cause for discovery under the RJA. The superior court denied his petition. The court identified that (1) McDaniel argued the gang enhancement statute causes disparate outcomes based on statistics evidencing the racial breakdown of individuals serving gang enhancements in state prison from San Mateo, whereas (2) his expert relied on the distribution of race for defendants arrested for sections 664/187, subdivision (a), or section 186.22 violations compared to those incarcerated for the same violations. It concluded McDaniel's expert "did not rely on the disparity that [McDaniel] set forth in support of his discovery motion, and neither set of statistics provides the requisite specific facts necessary to satisfy the threshold requirement announced in *Young*."

McDaniel then filed the pending writ petition with this court. Following receipt of an informal response, this court issued an order to show cause why the requested relief should not be granted.

## DISCUSSION

McDaniel's petition contends the trial court erred in concluding his discovery motion failed to demonstrate good cause under the RJA. Specifically, McDaniel asserts a "plausible factual foundation" for showing good cause does not require evidence of case-specific facts, but instead may rely solely on statistical evidence indicating disparate charging based on the race of the defendant.

" 'Writ review is appropriate in discovery matters where, as here, it is necessary to address "questions of first impression that are of general importance to the trial courts and to the [legal] profession, and where general guidelines can be laid down for future cases." [Citation.] The standard of review for a discovery order is abuse of discretion, because management of

6

discovery lies within the sound discretion of the trial court.' [Citation.] We review the factual underpinnings of a discretionary determination for substantial evidence [citation], but where such a determination rests on 'incorrect legal premises,' our review is de novo [citations]." (*Young, supra*, 79 Cal.App.5th at p. 156.)

## I.  The Racial Justice Act

In *Young, supra*, 79 Cal.App.5th 138, our colleagues in Division Four comprehensively discussed the legal landscape leading to the Legislature's enactment of the RJA.  We will not restate that discussion in detail, but instead highlight those key aspects most pertinent to the issue before us.

The RJA, effective January 1, 2021, added section 745 to the Penal Code.  The Legislature enacted the RJA in response to then-prevailing law, stating " '[c]urrent law, as interpreted by the courts, stands in sharp contrast' to the Legislature's strong commitment to root out discrimination in the criminal justice system and runs contrary to the Legislature's declared acknowledgement that 'all persons possess implicit biases . . . , that these biases impact the criminal justice system . . . , and that negative implicit biases tend to disfavor people of color.' " (*Young, supra*, 79 Cal.App.5th at pp. 149–150.)  The express intent of the RJA was to "eliminate racial bias from California's criminal justice system" and "ensure that race plays no role at all in seeking or obtaining convictions or in sentencing." (Assem. Bill No. 2542 (2019–2020 Reg. Sess.) § 2(i).)

Specifically, the Legislature sought to depart from United States Supreme Court precedent requiring defendants to demonstrate discriminatory purpose under the equal protection clause.  (See, e.g., *McCleskey v. Kemp* (1987) 481 U.S. 279, 292 (*McCleskey*) [statistical showing that race likely influenced imposition of death penalty held insufficient to

warrant reversal because "to prevail under the Equal Protection Clause, [the defendant] must prove that the decisionmakers in *his* case acted with discriminatory purpose"]; *Batson v. Kentucky* (1986) 476 U.S. 79, 93 ["the 'invidious quality' of governmental action claimed to be racially discriminatory 'must ultimately be traced to a racially discriminatory purpose' "].)  For example, in *United States v. Armstrong* (1996) 517 U.S. 456 (*Armstrong*), five Black defendants sought discovery to demonstrate Black individuals were disproportionately charged for drug crimes in federal court, which resulted in higher sentences than White individuals prosecuted for the same offense in state court.  (*Id.* at pp. 458–460.)  The Supreme Court concluded courts have "inherent authority to order discovery" if there is " ' "some evidence tending to show the existence of the essential elements of the defense," discriminatory effect *and discriminatory intent.*' "  (*Young*, *supra*, 79 Cal.App.5th at p. 154, quoting *Armstrong*, at pp. 463, 468–469, italics added.)  The *Armstrong* court further emphasized a selective prosecution claim required a "rigorous standard for discovery" because of the " 'presumption of regularity' " underlying prosecutorial decisions. (*Armstrong*, at pp. 464, 468.)  Citing *McCleskey*, the Legislature found "[e]xisting [judicial] precedent . . . accepts racial disparities in our criminal justice system as inevitable."  (Assem. Bill No. 2542 (2019–2020 Reg. Sess.) § 2(f).)

In rejecting this framework, the Legislature enacted a statutory scheme that "eliminates any requirement to show discriminatory purpose (§ 745, subds. (a)(2), (f)) and permits violations of the Act to be established based on statistics (§ 745, subds. (c)(1), (h)(1))," directly refuting *McCleskey* and *Armstrong*.  (*Young*, *supra*, 79 Cal.App.5th at p. 153; see also Assem. Bill No. 2542 (2019–2020 Reg. Sess.) § 2(j) [Legislature sought to "eliminate

racially discriminatory practices in the criminal justice system, in addition to intentional discrimination"].)  The Legislature explained, "Implicit bias, although often unintentional and unconscious, may inject racism and unfairness into proceedings similar to intentional bias.  The intent of the Legislature is not to punish this type of bias, but rather to remedy the harm to the defendant's case and to the integrity of the judicial system."  (Assem. Bill No. 2542 (2019–2020 Reg. Sess.) § 2(i); § 745, subd. (c)(2) ["The defendant does not need to prove intentional discrimination."].)

Section 745, subdivision (a), thus provides that "[t]he state shall not seek or obtain a criminal conviction or seek, obtain, or impose a sentence on the basis of race, ethnicity, or national origin."  Section 745 then identifies various types of violations under the RJA, including when a defendant "was charged or convicted of a more serious offense than defendants of other races, ethnicities, or national origins who have engaged in similar conduct and are similarly situated, and the evidence establishes that the prosecution more frequently sought or obtained convictions for more serious offenses against people who share the defendant's race, ethnicity, or national origin in the county where the convictions were sought or obtained."  (§ 745, subd. (a)(3).)

Section 745, subdivision (h)(1) defines "more frequently sought or obtained" as that term appears in section 745, subdivision (a)(3).  That subdivision states, " 'More frequently sought or obtained' or 'more frequently imposed' means that the totality of the evidence demonstrates a significant difference in seeking or obtaining convictions or in imposing sentences comparing individuals who have engaged in similar conduct and are similarly situated, and the prosecution cannot establish race-neutral reasons for the disparity.  The evidence may include statistical evidence, aggregate data, or nonstatistical evidence.  Statistical significance is a factor the court may

9

consider, but is not necessary to establish a significant difference. In evaluating the totality of the evidence, the court shall consider whether systemic and institutional racial bias, racial profiling, and historical patterns of racially biased policing and prosecution may have contributed to, or caused differences observed in, the data or impacted the availability of data overall. Race-neutral reasons shall be relevant factors to charges, convictions, and sentences that are not influenced by implicit, systemic, or institutional bias based on race, ethnicity, or national origin." (§ 745, subd. (h)(1).)

In the event a defendant believes a violation of the RJA occurred, he or she "may file a motion requesting disclosure to the defense of all evidence relevant to a potential violation of subdivision (a) in the possession or control of the state." (§ 745, subd. (d).) "Upon a showing of good cause, the court shall order the records to be released." (*Ibid.*)

*Young*, *supra*, 79 Cal.App.5th 138 is the first and only published Court of Appeal case to consider the meaning of "good cause" under section 745, subdivision (d). In *Young*, the court analogized the "good cause" requirement in the RJA to the good cause standard for *Pitchess*[4] motions. The court explained that, under *Pitchess*, good cause "exists when a defendant shows both ' "materiality" to the subject matter of the pending litigation and a "reasonable belief" that the agency has the type of information sought.' [Citation.] *Pitchess* 'good cause' is a 'relatively relaxed standard[]' intended to 'insure the production for inspection of all potentially relevant documents.' " (*Young*, at p. 158.) The *Pitchess* good cause standard does not require a showing that alleged misconduct "was 'probable' or 'apparently

---

[4] *Pitchess v. Superior Court* (1974) 11 Cal.3d 531. *Pitchess* discovery provides the process governing disclosure of law enforcement personnel records.

credible,' " but only that it " 'could or might have occurred.' " (*Young*, at p. 158.)

In applying this interpretation of good cause to the RJA, the *Young* court concluded that "in order to establish good cause for discovery under the [RJA], a defendant is required only to advance a plausible factual foundation, based on specific facts, that a violation of the [RJA] 'could or might have occurred' in his case." (*Young*, *supra*, 79 Cal.App.5th at p. 159.) The court emphasized good cause under the RJA is a "minimal standard" that is "in some respects even more relaxed than the 'relatively relaxed standard[ ]' " for *Pitchess* motions. (*Young*, at p. 159.) Because "a section 745, subdivision (a) violation may be proved up in several different ways based on a variety of direct or circumstantial evidence of discrimination under subdivision (a)(1)– (4), the threshold showing for good cause must be commensurately broad and flexible." (*Id.* at p. 160.) In addition, a low threshold for entitlement to discovery is in accord with the RJA and its escalating burdens of proof. (*Young*, at p. 160.)

The *Young* court then considered these principles in connection with Young's RJA allegations. In support of his allegations of racial bias, Young offered the following evidence: (1) his race (Black); (2) California studies showing Black drivers are the racial group most likely to be stopped by police; and (3) circumstances of the traffic stop leading to Young's arrest suggesting it was racially motivated. (*Young*, *supra*, 79 Cal.App.5th at p. 161.) The court rejected the Attorney General's argument that Young would need to also make a showing of charging disparity to obtain discovery relating to the prosecution's charging decision under section 745, subdivision (a)(3). (*Young*, at p. 162.) It reasoned that such a requirement would "present[] a quandary for defendants seeking to pursue allegations of race-based selective

11

prosecution that we think is inconsistent with the legislative intent behind the Act. '[M]ost of the relevant proof in selective prosecution cases will normally be in the Government's hands.' [Citation.] Preventing a defendant from obtaining information about charging decisions without first presenting that same evidence in a discovery motion is the type of a catch-22 the Act was designed to eliminate." (*Ibid.*) The court emphasized that, unlike federal courts who sought to "minimize the potential for insubstantial claims," the California Legislature "was focused, instead, on creating a discovery-triggering standard that is low enough to facilitate potentially substantial claims, even if it came at some cost to prosecutorial time and resources." (*Id.* at p. 163, italics omitted.) The court thus reversed and remanded for the trial court to reconsider whether Young had shown good cause for the requested discovery. (*Id.* at p. 166.)

## II. McDaniel Met His Burden of Proof for Discovery Under the RJA

Here, the Attorney General contends McDaniel is not entitled to relief because he failed to demonstrate good cause for discovery as required by the RJA. Specifically, the Attorney General argues McDaniel failed to meet the framework established in *Young* by not alleging any case-specific facts. The Attorney General asserts McDaniel's reliance solely on statistical data is insufficient to establish a plausible factual foundation to meet the good cause standard. We disagree.

### 1. Whether the RJA Requires Case-specific Facts

We first evaluate whether the statutory language of the RJA provides any guidance as to what evidence may support a defendant's request for discovery. " 'When we interpret a statute, "[o]ur fundamental task . . . is to determine the Legislature's intent so as to effectuate the law's purpose. We first examine the statutory language, giving it a plain and commonsense

12

meaning. . . . If the language is clear, courts must generally follow its plain meaning unless a literal interpretation would result in absurd consequences the Legislature did not intend. If the statutory language permits more than one reasonable interpretation, courts may consider other aids, such as the statute's purpose, legislative history, and public policy." [Citation.] "Furthermore, we consider portions of a statute in the context of the entire statute and the statutory scheme of which it is a part, giving significance to every word, phrase, sentence, and part of an act in pursuance of the legislative purpose." ' " (*City of San Jose v. Superior Court* (2017) 2 Cal.5th 608, 616–617.)

As noted above, a defendant may demonstrate an RJA violation if (1) "[t]he defendant was charged or convicted of a more serious offense than defendants of other races . . . who have engaged in similar conduct and are similarly situated," and (2) the evidence demonstrates "a significant difference" in the prosecution seeking or obtaining convictions "for more serious offenses against people who share the defendant's race . . . in the county where the convictions were sought or obtained." (§ 745, subds. (a)(3), (h)(1).) When evaluating whether prosecutors "more frequently sought or obtained" convictions against individuals of certain races, section 745, subdivision (h)(1) allows defendants to rely on "statistical evidence, aggregate data, *or* nonstatistical evidence." (Italics added.) Accordingly, the express language of the RJA does not mandate a particular type of evidentiary showing but rather allows the possibility that defendants could attempt to rely solely on statistical evidence as proof of disparate charging.[5] (See *Young*,

---

[5] We do not opine on whether a defendant would be able to prove an RJA violation at the prima facie or later stages based on statistical evidence alone.

13

*supra*, 79 Cal.App.5th at p. 160 ["the threshold showing for good cause must be . . . broad and flexible"].)

Moreover, proof of a section 745, subdivision (a)(3) violation—e.g., differences in seeking or obtaining convictions and differences in imposing sentences—calls for systemic or institutional analyses that are most likely demonstrated at least in part through statistical evidence. Thus, the statutory language of the RJA supports McDaniel's use of statistical evidence as an appropriate mechanism for proving racial disparity in charging.

This interpretation is not in conflict with *Young*. In that case, the court held a defendant may establish good cause for discovery under the RJA by "advanc[ing] a plausible factual foundation, based on specific facts, that a violation of the [RJA] 'could or might have occurred' in his case." (*Young*, *supra*, 79 Cal.App.5th at p. 159.) Young sought to meet this burden with a combination of statewide and out-of-county statistics and case-specific facts indicating racial bias in connection with his traffic stop. (*Id.* at p. 161.) In considering this evidence, the court agreed with the Attorney General that Young's statewide and out-of-county statistics did not, alone, provide "a particularly strong case of racial profiling" because it "fail[ed] to focus directly on Solano County" and lacked statistical controls. (*Id.* at p. 166.) However, the court noted that these flaws in Young's statistical evidence "serve to illustrate how the good cause standard works. At this stage, he need not make a strong case but only a plausible one." (*Ibid.*) The court explained the facts of the traffic stop "arguably tip[] the scale from a situation in which [Young] is speculating about possible racial profiling to one in which, in his case, specific facts arguably provide circumstantial proof of the substance of the allegation." (*Ibid.*)

14

Here, the primary question is whether the prosecutor's decision to charge McDaniel with a gang enhancement was the result of racial bias. In other words, would Black defendants be more likely to be charged with gang enhancements than White defendants under similar circumstances? In such a scenario, case-specific facts—apart from a defendant's race and the charges against him—may not be persuasive evidence of potential racial bias. Instead, county-level data reflecting a racial disparity in charging or convictions may provide a plausible basis for asserting that an RJA violation "could or might have" occurred. (See *Young*, *supra*, 79 Cal.App.5th at pp. 159, 161 ["the plausible justification standard [under the RJA discovery provision] . . . should not be difficult to meet"]; *id*. at pp. 168–169 ["Where the defendant makes a showing of plausible justification that there was or could have been a violation of the Racial Justice Act, thus triggering access to 'all relevant evidence' [citation] concerning a potential violation . . . , it will likely be an abuse of discretion to 'totally foreclose[]' discovery."].)

This approach was endorsed by the appellate division of the Santa Clara County Superior Court in *Gonzalez v. Superior Court* (2024) 108 Cal.App.5th Supp. 36 (*Gonzalez*). The *Gonzalez* court considered what evidentiary showing would meet "the threshold for establishing a plausible factual scenario for discovery under section 745[, subdivision] (d)." (*Gonzalez*, at p. Supp. 54.) It concluded the court in *Young* relied on evidence of racial profiling as well as statistical data "because the statistical evidence showing disparities . . . was only statewide and out of county, *not* generated at the local, county level." (*Gonzalez*, at p. Supp. 63.) *Young* "did not set both as a requirement for [establishing] a plausible factual foundation or a good cause

15

showing." (*Gonzalez*, at p. Supp. 63.) While Gonzalez's evidentiary showing[6] was "not strong" and "more will be required" to prove a prima facie case, the court concluded the statistical data was "enough to meet the low threshold of a plausible factual foundation that an RJA violation could or might have occurred in his case." (*Id.* at p. Supp. 65.) And challenges to the "methodologies used in the data and statistics" or arguments regarding "overbreadth" are appropriately addressed at later stages "when the burden is higher." (*Ibid.*)

We agree with the reasoning set forth in *Young* and *Gonzalez*. In seeking discovery, parties only need to show plausibility based on "specific facts." (*Young, supra*, 79 Cal.App.5th at p. 159.) That showing could be met by *case*-specific facts, as offered in *Young*. Or it could be met by specific statistical facts relevant to the charges and individuals involved, as in *Gonzalez*. Or both. Neither the RJA nor *Young* requires any particular type of "specific facts." Nor do we. Rather, courts should focus on the relevance of the proffered facts to the claims of racial bias to determine whether a

---

[6] In support of his discovery request, Gonzalez offered the following evidence: "(1) he is Latinx; (2) he has been charged with violating section 148, subdivision (a)(1) as a stand-alone offense; (3) according to the July 2021 United States Census, the population of Santa Clara County is 25 percent Latinx; (4) according to the People's own data from the [district attorney's office's] 'Race and Prosecutions Report: 2022 Update,' 68 percent of those charged with violating section 148, subdivision (a)(1), are Latinx; (5) internal and historical [public defender's office] data suggests some similar racial disparities or disparate impacts in the prosecution of charges for resisting arrest in Santa Clara County; and (6) [an expert] opinion that these overall statistical disparities are likely not due to chance and could reasonably be attributed to bias in policing and/or prosecution but the state of the data is currently insufficient to conduct deeper statistical analysis with which to draw further conclusions." (*Gonzalez, supra*, 108 Cal.App.5th at p. Supp. 63.)

minimally plausible basis exists to grant discovery—a low threshold.

### 2. *Whether McDaniel Demonstrated Good Cause for Discovery*

In support of his discovery request, McDaniel submitted various statistical evidence, including: (1) the non-Latino Black population in San Mateo County was only 2.7 percent; (2) from October 1, 1988, to November 10, 2021, out of the discharged or non-discharged felons with a section 186.22, subdivision (b) or 186.22, subdivision (a) enhancement conviction from San Mateo County, 9.62 percent of those individuals were Black, as opposed to 3.78 percent who were White; (3) of the 118 individuals serving gang enhancements in state prison from San Mateo County in 2020, 83.63 percent were Latinx, 10.9 percent were Black, and 3.63 percent were White; (4) on any given day in 2021, the Black arrest rate in San Mateo County was 6.6 times the arrest rate of White individuals; and (5) between 2017 and 2019 in San Mateo County, 5.4 percent of Black kids admitted to being members of gangs, as compared to 2.6 percent of White kids. In addition, McDaniel submitted general evidence that both the Legislature and the Committee on Revision of the Penal Code opined that gang-related charges and enhancements are applied inconsistently and disproportionately against people of color, as reportedly evidenced by the disproportionate number of Black individuals versus White individuals listed in the CalGang database. (See Stats. 2021, ch. 699, § 2(a), No. 7 West's Cal. Legis. Service, p. 8861.)

Finally, McDaniel submitted an expert declaration, which addressed whether a racial disparity could or might exist in San Mateo County regarding sections 664/187 and section 186.22 charges. Dr. Redbird, a sociology assistant professor with a background in statistics and data analysis, stated she evaluated (1) available county law enforcement data on

17

arrests and bookings, and (2) incarceration data provided by the California Department of Corrections and Rehabilitation; she then compared the racial demographics of those arrested for sections 664/187 or 186.22 charges versus those incarcerated for such offenses. Based on her review of this data, Dr. Redbird concluded there was a "robust" disparity in connection with sections 664/187 charges and a "valid (if not accurate)" disparity in connection with section 186.22 charges. In connection with incarceration for sections 664/187 charges, Dr. Redbird found "Blacks are overrepresented in incarceration by 17.5% while Whites are underrepresented by 31.7%, an 49% difference." As to the section 186.22 gang charge, she noted a 147 percent increase in Black incarceration versus booking. While the increase in White incarceration was greater, she noted it reflected "an increase of only one person" because so few White individuals were booked on gang charges. She concluded "the increase in Black representation in incarceration is substantial, which suggests observed outcomes results from at least *some* actual disparity," rather than from methodological artifacts alone. She explained various constraints with her analysis "can readily be corrected with better data that would allow for a more finely-tuned examination of disparity in charging."

Here, McDaniel provided county-specific data suggestive of a disparity between the racial composition of San Mateo County and the racial composition of those charged with gang or gang enhancement charges. He also provided broader data and information to contextualize the county-specific data, as well as an expert declaration evaluating charging and incarceration rates and concluding that available data indicates "some actual disparity." While in no way definitive, this evidence presents specific facts of actual racial disparities in gang and gang enhancement charges brought by prosecutors in San Mateo County. And those disparities are sufficient to

18

support a *plausible* claim that gang charges *could or might* be impacted by racial bias. As noted by *Young*, "the plausible justification standard [under the RJA discovery provision] . . . should not be difficult to meet." (*Young*, *supra*, 79 Cal.App.5th at p. 161.)

Despite finding the statistical evidence of racial disparities "somewhat persuasive," the trial court ultimately denied the motion because it concluded the evidence was "missing context." Specifically, the court raised questions regarding (1) the percentage of ethnicities of all gang members in the county, and (2) the fact that the defendants were not from San Mateo County. It found McDaniel needed to present additional specific facts to make his RJA claim "plausible."

Undoubtedly, courts must provide some review of statistical data, even at the discovery stage. (Cf. *Finley v. Superior Court* (2023) 95 Cal.App.5th 12, 22 (*Finley*) [at the prima facie stage, "a court should not accept the truth of [expert declarations and statistical information] if it is 'conclusory' and 'made without any explanation.' [Citation.] In this regard, the court serves a 'gatekeeping role' to exclude expert opinions and statistics that are speculative or unsupported."].) As noted in *Young*, statewide or out-of-county data could be insufficient because it may not reflect the charging decisions of a particular district attorney's office.[7] (See *Young, supra,* 79 Cal.App.5th at p. 166.) But if the statistical data demonstrates an actual racial disparity in the charging decisions of the county, weaknesses in the data pool or concerns about additional data points do not necessarily negate the plausible factual

---

[7] In so stating, we do not intend to suggest that such data could never support discovery under the RJA. Rather, as discussed herein, courts must evaluate the proffered data on a case-by-case basis.

foundation that an RJA violation "could or might have occurred."[8] (*Young*, *supra*, 79 Cal.App.5th at p. 159.)

In enacting section 745, subdivision (d), the Legislature rejected *Armstrong*'s "rigorous standard for discovery" (*Armstrong*, *supra*, 517 U.S. at p. 468), and instead focused "on creating a discovery-triggering standard that is low enough to *facilitate potentially substantial claims*, even if it came at some cost to prosecutorial time and resources" (*Young*, *supra*, 79 Cal.App.5th at p. 163). Accordingly, requiring a statistical analysis that proves racial bias would impose a greater burden than required by statute at the discovery stage. Relevant data may not always be accessible without discovery of information in the possession of government officials. (*Young*, at p. 162 ["Preventing a defendant from obtaining information about charging decisions without first presenting that same evidence in a discovery motion is the type of a catch-22 the Act was designed to eliminate."]; see, e.g., Premkumar & Cremin, Unpacking California's Racial Justice Act (Dec. 18, 2024) Public Policy Institute of California <https://www.ppic.org/blog/unpacking-californias-racial-justice-act> [as of May 19, 2025] ["Currently, court and prosecutorial data are collected separately[,] . . . kept at the county level[,] and normally not publicly available."].) As such, imperfect data should not automatically be deemed insufficient to trigger the RJA's discovery provisions, particularly in light of the Legislature's broad intent to combat racial bias. (Assem. Bill No. 2542 (2019–2020 Reg. Sess.) § 2(i) ["racism in any form or amount, at any stage of

---

[8] At the prima facie stage, trial courts' review of statistical information " ' "must be solely on principles and methodology, not on the conclusions that they generate." ' " (*Finley*, *supra*, 95 Cal.App.5th at p. 23.) A trial court's review of such information at the discovery stage, which imposes an even a lower burden of proof on defendants, must be more lenient.

a criminal trial, is intolerable"]; *Gonzalez*, *supra*, 108 Cal.App.5th at p. Supp. 65 [challenges to the "methodologies used in the data and statistics" or arguments regarding "overbreadth" should be reserved for later stages "when the burden is higher"].)

Instead, courts should ask whether the proffered evidence supports the defendant's claim that the requested discovery is potentially relevant to an ultimate RJA claim. For example, evidence regarding gang-charging decisions could be relevant to whether a district attorney's office has an implicit or explicit bias toward categorizing interactions as gang related based on the race of the participants. Or data regarding charging and convictions could reflect that prosecutors more frequently pursue gang charges against Black defendants with accomplices whereas such charges are not filed against White or other defendants with accomplices. These are merely examples of how requested discovery could result in evidence relevant to an RJA claim.

In sum, the requisite showing at the discovery stage is a low bar, and defendants may meet this showing through various types of evidence. In *Young*, the defendant offered statewide and out-of-county statistics and case-specific facts. In *Gonzalez*, the defendant relied on local statistics and an expert declaration providing an initial assessment that those statistics indicated a racial disparity. Here, McDaniel has provided county-specific data that presented a "plausible" showing of a racial disparity, supported by an expert declaration supporting the possibility of an actual racial disparity. While McDaniel will need to meet a higher burden to demonstrate a prima facie case under the RJA, the discovery he requests—e.g., lists of cases involving the same or similar charges, race and ethnicity of defendants in those cases, enhancements and prior conviction allegations regarding those

21

charges and defendants—is reasonably calculated to disclose evidence that illuminates whether a charging disparity exists between defendants "who have engaged in similar conduct and are similarly situated." (§ 745, subd. (a)(3).) At the discovery stage, requiring defendants to resolve all statistical flaws or provide analysis from a larger data pool, when such data has not yet been provided by the district attorney's office, would not be consistent with the legislative intent behind the Act. (*Young*, *supra*, 79 Cal.App.5th at p. 162; *Gonzalez*, *supra*, 108 Cal.App.5th at p. Supp. 65.) Indeed, it would require a defendant to provide the very documentation that he or she seeks through discovery to develop his or her RJA claim. The Legislature sought to eliminate this "type of catch-22" under the RJA. (*Young*, at p. 162.)

### 3. *Remand Is Appropriate for the Trial Court to Consider the Appropriate Scope of Discovery in the First Instance*

While McDaniel has offered sufficient evidence to demonstrate a plausible factual foundation for discovery under the RJA, a question remains regarding the appropriate scope of his request. As explained in *Young*, " '[t]he trial court, in deciding whether the defendant shall be permitted to obtain discovery of the requested material, must consider and balance a number of [other] factors' [citation], '[s]pecifically . . . (1) whether the material requested is adequately described, (2) whether the requested material is reasonably available to the governmental entity from which it is sought (and not readily available to the defendant from other sources), (3) whether production of the records containing the requested information would violate (i) third party confidentiality or privacy rights or (ii) any protected governmental interest, (4) whether the defendant has acted in a timely manner, (5) whether the time required to produce the requested information will necessitate an unreasonable delay of defendant's trial, [and]

22

(6) whether the production of the records containing the requested information would place an unreasonable burden on the governmental entity involved.' " (*Young*, *supra*, 79 Cal.App.5th at pp. 144–145, quoting *City of Alhambra v. Superior Court* (1988) 205 Cal.App.3d 1118.) However, "[w]here the defendant makes a showing of plausible justification that there was or could have been a violation of the [RJA], thus triggering access to 'all relevant evidence' [citation] concerning a potential violation of section 745, subdivision (a), it will likely be an abuse of discretion to 'totally foreclose[]' discovery." (*Young*, at pp. 168–169.)

In considering whether McDaniel's requests for disclosure may give rise to relevant evidence, the trial court must determine whether they are "reasonably calculated to lead to discovery of admissible evidence probative of a section 745, subdivision (a) violation." (*Young*, *supra*, 79 Cal.App.5th at p. 160.) The trial court may consider, among other factors, whether the requests are reasonably calculated to produce evidence of cases involving similarly situated individuals and similar conduct.

We thus remand to the trial court to engage in a discretionary weighing of the *Alhambra* factors, including the potential probative value of the information he seeks, and the burdens of gathering the requested "records or information" for disclosure.[9] (§ 745, subd. (d); *Young*, *supra*, 79 Cal.App.5th at pp. 160, 168–169.)

_____

[9] In *Young*, the court remanded the matter for the trial court to consider in the first instance both the question of whether the defendant demonstrated a plausible factual foundation for discovery as well as the above *Alhambra* factors. The court explained that based on "the limited record before us" and " '[b]ecause the standard we announce is new, the proper course is to remand to the trial court for application of the . . . test formulated above to the facts of this case.' " (*Young*, *supra*, 79 Cal.App.5th at pp. 166, 169.) Here, we decide the question of whether McDaniel demonstrated a plausible factual foundation for discovery because that

23

## DISPOSITION

Let a peremptory writ of mandate issue directing respondent superior court to vacate its order denying McDaniel's motion for discovery under the Racial Justice Act, and to conduct a new hearing to reconsider McDaniel's discovery motion in a manner consistent with this opinion.


PETROU, J.


WE CONCUR:


TUCHER, P.J.


FUJISAKI, J.


A171858
*McDaniel v. Superior Court*

---

question was considered by the trial court, and it erroneously concluded McDaniel failed to make such showing. We remand for the court to consider the *Alhambra* factors because the parties did not address, and the trial court did not reach, that issue.

Trial Court: San Mateo County Superior Court

Trial Judge: Hon. Michael K. Wendler

Counsel:

Law Office of Matt Sullivan and Matt Sullivan for petitioner.

Chesa Boudin and Andrea Crider for UC Berkeley Law, Criminal Law & Justice Center as Amicus Curiae on behalf of petitioner.

No appearance for respondent.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Bridget Billeter and Donna M. Provenzano, Supervising Deputy Attorneys General, and Julia Y. Je, Deputy Attorney General for real party in interest.